UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| YOLANDA MURPHY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 05 C 5279 |
| ) | |
| OWENS ILLINOIS A.K.A. GRAHAM ) | Judge Rebecca R. Pallmeyer |
| PACKAGING PLASTIC PRODUCTS, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Yolanda Murphy works as a machine operator at a blow-molded plastic products manufacturing plant now owned by Defendant Graham Packaging Plastic Products, L.P. ("Graham"). In this lawsuit, she charges Graham and co-Defendant Owens-Illinois, Inc. ("Owens"), the plant's former owner, with sex discrimination and retaliation in violation of Title VII of the Civil Rights Act. Both Defendants have moved for summary judgment. For the reasons explained in this opinion, Defendant Owens' motion is granted in part and denied in part. Defendant Graham's motion is granted.

**FACTS**[1]

**Procedural Background**

Plaintiff began working for Owens-Brockway Plastic Products, Inc., a wholly-owned subsidiary of Owens, in January 1996. (Owens 56.1 ¶ 1.) On October 7, 2004, Graham purchased

---

[1] The facts presented here are drawn from the parties' Local Rule 56.1 Statements: Defendant Owens's Local Rule 56.1 Statement (cited here as "Owens 56.1"); Defendant Graham Packaging's Local Rule 56.1 Statement ("Graham 56.1"); Plaintiff's Local Rule 56.1(b) Statement in Opposition to Defendant Owens's Statement ("Pltf.'s 56.1/Owens"); Plaintiff's Local Rule 56.1(b) Statement in Opposition to Defendant Graham Packaging's Statement ("Pltf.'s 56.1/Graham"), Defendant Owens's Response to Plaintiff's Additional Facts ("Owens Resp.") and Defendant Graham Packaging's Response to Plaintiff's Statement ("Graham Resp."). In addition to their responses to Plaintiff's 56.1 Statements, both Defendants have moved to strike portions of Plaintiff's Statements. For reasons explained in the court's presentation of facts, those motions are granted in part and denied in part.

the facility and became Plaintiff's employer.  (*Id.* ¶ 2; Graham 56.1 ¶ 2.)  Prior to that date, Plaintiff had filed two charges of discrimination.  The first, a sex discrimination charge filed on February 18, 2004, was settled in a written agreement on April 19, 2004.  (Graham 56.1 ¶¶ 6, 7; Mediation Settlement Agreement, Ex. 6 to Graham 56.1.)  Plaintiff's second charge, filed on September 23, 2004, alleged sex discrimination and retaliation over the period from April 28, 2004 through September 23, 2004.  (Owens 56.1 ¶ 3; Graham 56.1 ¶ 8.)  That second charge was pending as of the date of Graham's purchase of the facility where Plaintiff worked, and the parties agree that Owens alone is potentially liable for the conduct alleged in that charge. (Owens 56.1 ¶ 5; Graham 56.1 ¶ 11.)  On July 5, 2006, Plaintiff filed a third charge against her employer, alleging retaliation over a period from October 3, 2005 through June 2006; the parties agree that Graham alone is potentially liable for the conduct alleged in that third charge.  (Owens 56.1 ¶ 7; Graham 56.1 ¶ 11.)

**Plaintiff's History in the Apprenticeship Program**

Plaintiff began working for Owens as a packer.  In March 2002, she applied for admission into the Apprenticeship Program and after successfully completing the testing and interview process, was accepted into that program as a "Process Technician Apprentice."  (Graham 56.1 ¶ 12; Owens 56.1 ¶ 13.)  Apart from a period of time in 2002, during a temporary reduction in business, Plaintiff remained in the Apprenticeship Program through the date of Graham's purchase of the facility in October 2004.  (Owens 56.1 ¶¶ 14, 15; Graham 56.1 ¶ 14.)  As an Apprentice, Plaintiff was required to meet certain standards, provided to her in writing, including on-the-job training and completion of company-paid course work.  (Owens 56.1 ¶¶ 16-17, citing Apprenticeship Standards, Ex. 8 to Owens 56.1; Graham 56.1 ¶ 13.)  The Apprenticeship Standards provide that a joint labor-management committee interviews applicants, selects candidates, follows their progress, and provides regular evaluations.  (Owens 56.1 ¶ 18, citing Apprenticeship Standards at 9-10.)  Defendants assert that Plaintiff's training included work with journeymen and supervisors who provided assistance and feedback.  (Owens 56.1 ¶ 21.)  Defendants cite Plaintiff's testimony

that Derrick Thomas, a mechanic (though evidently not a journeyman) provided daily job training; that journeyman Bill Thomas worked with her "every once in a while"; that she received regular performance feedback from Mike Halinski and Ed Motes; that another mechanic trained her "how to work on the tray maker." (Deposition of Yolanda Murphy-Strong [hereinafter, "Murphy Dep."], Ex. 1 to Owens 56.1, at 67-69, 78, 107.)[2] Plaintiff nevertheless denies having received appropriate training. She testified specifically that she "didn't have no journeyman training me in 2004;" that "as for the training, was nobody training me;" and that "[i]t wasn't like they had somebody on the machine helping me out, training me, no." (*Id.* at 67, 69, 107.)

**Events Leading to Plaintiff's First Charge of Discrimination**

Diane McAdrian was Plaintiff's supervisor in late 2003 and early 2004.[3] Beginning in the second half of 2003, McAdrian raised concerns regarding Plaintiff's performance. (Owens 56.1 ¶ 22.) In a progress note on July 5, 2003, Ms. McAdrian wrote that Plaintiff "needs to be told over and over what to do and how to do it and still cannot do most jobs on her own" and that Plaintiff "does not seem to retain what she does learn." (McAdrian notes, Ex. 13 to Owens 56.1.) In a written evaluation dated November 9, 2003, McAdrian gave Plaintiff an overall job performance

---

[2] Owens also cites the affidavits of Diane Anderson and Keith Clark, but their affidavits state only that Halinski and Motes "had the skills and abilities" to provide training, not that Halinski and Motes actually did so. (Clark Affidavit, Ex. 10 to Owens 56.1, ¶ 6; Anderson Affidavit, Ex. 12 to Owens 56.1, ¶ 7.)

[3] Plaintiff asserts that Ms. McAdrian "gave [Plaintiff] incorrect information," and was unqualified to supervise her because McAdrian herself had not completed the apprenticeship program. (Pltf.'s 56.1 ¶¶ 69, 70.) To the extent these assertions (including Plaintiff's reference to a suspension, which was rescinded in response to a union grievance, Murphy Dep. at 47-48) relate to the time period prior to the filing of Plaintiff's first charge of discrimination, the court agrees with Defendants that they are not material, as the second and third charges are the basis of the complaint before the court. (Owens Resp. ¶¶ 69, 70, 72.) In any event, Plaintiff has not explained why the fact that McAdrian had not herself completed the apprenticeship program demonstrates that she was not qualified to act as Plaintiff's supervisor or that her acting as Plaintiff's supervisor constitutes sex discrimination. The court notes, further, that Plaintiff admitted that Ms. McAdrian gave her regular feedback and the opportunity to discuss Plaintiff's performance issues. (Murphy Dep. at 41, 43-44.)

3

rating of "poor." (Graham 56.1 ¶ 38.) A November 22, 2003 note stated, "For the length of time [Plaintiff] has been a mechanic and the training she has had she should be a [sic] more capable than she has been demonstrating. She does not have the mechanical aptitude she needs to do her job well." (McAdrian notes.)

On February 18, 2004, Plaintiff filed a grievance with her union and a charge of sex discrimination with the EEOC, alleging that she had been unfairly subjected to discipline for poor work performance. (Owens 56.1 ¶ 23.) In a March 19, 2004 performance evaluation, McAdrian again rated Plaintiff's performance as "poor." (Graham 56.1 ¶ 39.) The parties entered into a Mediation Settlement Agreement on April 19, 2004, in which Owens committed to monitoring Plaintiff's work to ensure that she received the same training opportunities as other apprentices in her department; agreed that the plant manger would meet with Plaintiff at least every other week to discuss her progress and any concerns she might have; and agreed, further, that any pending probationary notices would be expunged if she met performance expectations for the following three months. (Owens 56.1 ¶¶ 24-27.) The Agreement provided, in addition, that Plaintiff would contact an official in Owens's Equal Opportunity department if she had concerns about training. (Pltf.'s 56.1/Owens ¶ 66.) Plaintiff contends she did attempt to contact Dwayne Clark in Owens's EO department, but Mr. Clark never called her back. (*Id.*) Plaintiff did meet personally with Mr. Clark when he visited the plant some time in 2004. (Owens Resp. ¶ 66, citing Murphy Dep. at 60-61.)[4]

---

[4] Plaintiff characterizes this incident as an example of the hostile environment at the plant. (Pltf.'s 56.1/Owens ¶ 79.) That characterization is not supported by her testimony, however, in which she recalled only that, for reasons she does not explain, her supervisor Mike Halinski told her to "go ahead up there [and meet with Mr. Clark]; it don't make a difference." (Murphy Dep. at 60.) The court is unable to draw any conclusions from this incident.

**Events Leading to Plaintiff's Second Charge**

Effective May 1, 2004, Plaintiff received a pay increase from $17.69 to $18.04 per hour. (Owens 56.1 ¶ 28.) Her compensation, benefits, and work location remained the same through October 2004; she worked an eight-hour daytime shift and, although she contends she was denied overtime opportunities at some periods, Plaintiff is not claiming any damages for lost pay during the period from February through October 2004. (Owens 56.1 ¶¶ 29-35.)

Plaintiff's direct supervisors, Ed Motes and Mike Halinski, who worked with her on her daytime shift, prepared daily reports to track her training and performance, making notes of positive performance as well as incidents where Plaintiff needed improvement. To comply with the Mediation Settlement Agreement, Plant Manager Keith Clark and Human Resources Manager Diane Anderson sought daily input from Motes and Halinski and held regular meetings with Plaintiff in which they reviewed daily written evaluation notes and provided positive feedback as well as criticism. (Owens 56.1 ¶¶ 36, 37, 39, 40; Owens Resp. ¶ 62.)[5]

Apprentice training records show that by August 30, 2004, Plaintiff had completed more than half of the required 8000 hours of on-the-job training, and Plaintiff admits that she logged all the required training hours for the "job change" task. (Process Technician Apprenticeship Training Summary, Ex. 11 to Owens 56.1; Murphy Dep. at 122.) Motes and Halinski issued a performance evaluation at that time in which Plaintiff again received an overall job performance rating of "poor." (Graham 56.1 ¶ 40.) In August 2004, the joint labor-management apprenticeship committee provided its evaluation, noting that Plaintiff continued to show performance problems despite the

---

[5] Plaintiff denies this (Pltf.'s 56.1/Owens ¶ 36), but she has failed to identify "specific references to the affidavits, parts of the record, and other supporting materials relied upon" to establish a dispute of material fact, as required by this court's Local Rule 56.1(b)(3)(B). Her general reference to dozens of paragraphs in her own 56.1 Statement is insufficient for this purpose, particularly in light of her own deposition testimony acknowledging that she "had regular meetings" with Clark and Anderson, at which she had an opportunity to talk about her performance, and discuss the information in the written evaluations. (Murphy Dep., Ex. 1 to Owens 56.1 at 104.) Paragraph 35 of Owens 56.1 Statement is deemed admitted.

length of time she had been in the apprenticeship program. The evaluation also contained constructive criticism based upon the assessment of her immediate supervisors who had observed her work performance on a daily basis. (Owens 56.1 ¶ 42.)

On September 23, 2004, Plaintiff filed a second charge of discrimination with the EEOC in which she alleged that the daily monitoring of her activities and the poor performance evaluation on August 13, 2004 were a function of sex discrimination and retaliation. (September 23, 2004 EEOC Charge, Ex. 3 to Owens 56.1.)[6] Plaintiff alleged, further, that on the day she filed her charge, she "became aware" that she had been placed on probation some weeks earlier. (*Id.*) In fact, however, it is undisputed that the Apprenticeship Committee never issued a probation notice to Plaintiff until January 24, 2005. (Owens 56.1 ¶ 45.)

Leonard Morgan, a male apprentice, who, like Plaintiff, had completed more than half of the required hours of on-the-job training but had documented performance problems in 2004, received probationary notices as early as April and September 2004. (Owens 56.1 ¶¶ 46-48.) Plaintiff contends that she alone was subjected to daily evaluation; Production Manager John Weil testified that Morgan, too, was the subject of increased scrutiny, though Weil was "not sure" it was daily. (Pltf.'s 56.1/Owens ¶ 63; Weil Deposition, Ex. 12 to Graham 56.1, at 65.) Written training summaries reflect that both Morgan and Plaintiff had completed more than 4,000 hours of on-the-job training, but she asserts repeatedly that she in fact was denied the on-the-job instruction provided to her male co-workers. (Pltf.'s 56.1/Owens ¶ 64; Murphy Dep. Ex. 4 to Graham 56.1, at 23-24 ("No, I didn't have no on-the-job training. I trained myself.").)

Plaintiff contends that between February 2004 and September 2004 she "worked in a shop

---

[6] Plaintiff asserts that the "EEOC had her to file another charge based on her not being provided training." (Pltf.'s 56.1/Owens ¶ 68.) The testimony she cites does not support that statement, however. (*See* Murphy Dep. at 30: "they had me go down and file another charge" – no reference to lack of training.) And in fact, the second charge makes no specific mention of training.

6

with all men," was "given the worst jobs," and, unlike her male co-workers, "got no training from any other journeymen." (Pltf.'s 56.1/Owens ¶ 74.) Being the only woman in the apprenticeship program is not, by itself, evidence that Plaintiff herself was the victim of discrimination, however; and Plaintiff has not offered evidence of any incident in which she was treated less favorably than her co-workers with respect to job assignments. Instead, her major concern is her claim of unfair treatment with respect to training. She claims that, during the period between February and September 2004, some of her male co-workers were unwilling to work with her because "the other journeymens say I might hurt them;" she does not identify the individuals who made such statements. (Owens 56.1 ¶¶ 49-50; Pltf.'s 56.1/Owens ¶ 74; Murphy Dep. at 52.) She also testified, without specifying the date, that "the journeymens wrote a letter to [her supervisor] Ed Motes and said they don't want to train me, and they did not train me." (Pltf.'s 56.1/Owens ¶ 75, citing Murphy Dep. at 53.) On one occasion (again, the date is not identified in the record), Plaintiff's co-workers made a tool of foam rubber to mock her. (Murphy Dep. at 53: "I come in Monday, it be a little tool made out of piece of foam on the door. This is Yolanda tool.") Jesse Scialabba, a journeyman who was expected to help train her, told Plaintiff, "You are a nice person, but you'll [sic] never going to make it through the program." (Pltf.'s 56.1/Owens ¶ 78, citing Murphy Dep. at 58.) She claims that a co-worker, Derrick Thomas, told her that the chief mechanic, Ed Vogler (not Plaintiff's supervisor), had predicted that "won't no woman make it through this program." (Owens 56.1 ¶¶ 51, 52.) Plaintiff acknowledges that her direct supervisors, Mike Halinski and Ed Motes, gave her "feedback on what she did right or wrong," but contends that "they gave her no training, she was left to learn on her own. . . ." (Pltf.'s 56.1/Owens ¶ 84.)

Without identifying the dates or times of any conversations, Plaintiff asserts that she told management officials Diane Anderson, John Weil, Keith Clark, and Scott Pfaff, that she believed she was a victim of discrimination. (Pltf.'s 56.1/Owens ¶ 82.) Anderson recalled no such complaints (Deposition of Diane Anderson, Ex. 13 to Graham 56.1, at 22-23) and Clark has stated

7

that Plaintiff did not complain to him about overtime, hours of work, or shift assignments, and that she agreed she was given training opportunities. (Affidavit of Keith Clark, Ex. 10 to Owens 56.1 ¶ 10.) She contends that she "always" complained of discrimination to Ed Motes (Pltf.'s 56.1/Owens ¶ 89), but she acknowledges that neither Motes nor Mike Halinski was aware that she had filed an EEOC charge. (Pltf.'s 56.1/Graham ¶ 17.)[7]

Plaintiff has also identified instances of what she believes to be more favorable treatment of co-workers: Another participant in the Apprenticeship Program (one who, Plaintiff admits, was a good performer and a hard worker) was discovered to be working under an incorrect Social Security number but was not disciplined for this. (Owens 56.1 ¶ 54.) Male co-workers dawdled over coffee before beginning their morning shift; Plaintiff acknowledges, however, that as soon as her supervisor learned of this, he directed all of them to start work on time. (Owens 56.1 ¶ 55.) She testifies that two men who entered the apprenticeship program when she did were never moved from their shift, while Plaintiff herself was moved from the night to the day shift. (Pltf.'s 56.1/Owens ¶ 80.)

Plaintiff testified that she felt stress and depression as a result of the circumstances at the plant: concern that she would not complete the apprenticeship program, that she was denied training, that her job was in jeopardy, and that she was constantly being "written up" by one person based upon information provided by someone else. (Pltf.'s 56.1/Owens ¶ 91, citing Murphy Dep. at 50-60.) The only other woman who had ever participated in the apprenticeship program, Teresa Lanier, is a member of Plaintiff's extended family. (Pltf.'s 56.1/Owens ¶¶ 92, 93.) Plaintiff testified that at family gatherings, Lanier, who was in the apprenticeship program five years earlier than

---

[7] In response to Owens's 56.1 Statement, Plaintiff denies that Halinski was unaware of her EEOC charge, but the material she cites refers only to complaints she made to Motes and to the union. (Pltf.'s 56.1/Owens ¶ 52.) And, in her response to Graham's 56.1 Statement, Plaintiff has admitted that neither Halinski nor Motes was aware of the EEOC charges. (Pltf.'s 56.1/Graham ¶ 17.)

8

Plaintiff, told Plaintiff that she didn't expect to complete the program because "they don't allow no womens. It's an all mens program." (Pltf.'s 56.1/Owens ¶ 94.) Lanier herself denied having had such a conversation with Plaintiff. (Deposition of Teresa Lanier, Ex. 39 to Graham 56.1, at 13-14.) In fact, Ms. Lanier left the apprenticeship program after a year and a half to take a promotion to a position as production supervisor. (Lanier Dep. at 12.) She testified that she did not feel she was treated differently on the basis of her sex. (Lanier Dep. at 13.)

**Events Leading to Plaintiff's Third Charge**

    **A.    Probation Notices**

As noted earlier, Defendant Graham purchased the plant where Plaintiff worked in October 2004. On January 24, 2005, the Plant Apprenticeship Committee issued its first notice placing Plaintiff on probation for three months due to poor work performance. (Graham 56.1 ¶ 41, citing Murphy Dep. at 212.) Being placed on probation means simply that the employee is required to improve her work performance; there is no reduction in pay, hours of work, or benefits, and no change in the location of the work. (Graham 56.1 ¶ 44.) On May 26, 2005, the date of the next performance evaluation that appears in this record, Motes and Halinski rated Plaintiff's job performance as "poor." (Graham 56.1 ¶ 42.) The Plant Apprenticeship Committee issued a notice of a second probationary period on July 18, 2005. (Graham 56.1 ¶ 43.) Plaintiff is unaware of any communications between Halinski or Motes and the Apprenticeship Committee, does not know what Motes or Halinski honestly believed about her work performance, and acknowledged that Motes and Halinski were entitled to use their judgment in issuing her performance evaluations. (Graham 56.1 ¶¶ 45-47; Murphy Dep. at 230-31.) Defendant Graham asserts that the Apprenticeship Committee, made up of three union representatives and three management representatives, make all decisions relating to the apprentices. (Graham 56.1 ¶ 18, citing the Affidavit of Committee member Scott Pfaff and the depositions of Committee member John Weil

and Human Resources Manager Diane Anderson.)[8]  Plaintiff herself has never been on the Apprenticeship Committee, and has no personal knowledge of any discussions or conversations the Committee had relating to their personnel decisions, other than the meetings where she herself was given evaluations.  (Graham 56.1 ¶ 19.)

   **B.     Attendance**

Under Graham's general attendance policy, an hourly employee who accumulates thirteen "attendance points" is subject to suspension pending termination.  (Graham 56.1 ¶ 20.)  On July 1, 2005, the Apprenticeship Committee adopted a more stringent attendance policy for apprentices, under which any apprentice who accumulates nine attendance points will be removed from the Apprenticeship Program.  (Graham 56.1 ¶ 21.)  Although Plaintiff challenges the reasons for adoption of this policy, she does not dispute that it applied to all apprentices, including her.  (Pltf.'s 56.1/Graham ¶¶ 23, 24.)  Plaintiff had 10.5 attendance points as of July 1, 2005, but was granted an allowance to permit her to remain in the program unless she reached eleven points.  (Graham 56.1 ¶¶ 25; Apprenticeship Committee Notice, Ex. 20 to Graham 56.1.)  On September 1, 2005 and September 3, 2005, Plaintiff accumulated additional points for leaving work early; Plaintiff acknowledges these early departures, but contends that Graham denied her leave to which she

---

[8]     Plaintiff denies this, citing certain other paragraphs in her own 56.1 Statement, but the portions of the record cited in those other paragraphs do not contradict Defendant Graham's evidence that the Committee made final decisions regarding apprentices.  (*Cf.* Pltf.'s 56.1/Graham ¶ 67 (Mediation Agreement provides that the employer's "Vice President of EO" would monitor Plaintiff's training); ¶ 79 (Diane McAdrian was unfamiliar with the work of mechanics), ¶ 82 (male co-workers refused to train Plaintiff and made a foam rubber "tool" in an effort to mock her), ¶ 85 (journeyman Jesse Scialabba told Plaintiff she would not complete the program), ¶ 90 (Derrick Thomas, a mechanic but not a journeyman, provided Plaintiff with training), ¶ 116 (in September 2006, Plaintiff complained to union officials and to Diane Anderson that she was denied leave to which she was entitled under the Family and Medical Leave Act).)  Plaintiff notes that it was Diane Anderson and Keith Clark, neither of whom had completed the Apprenticeship Program or worked as an apprentice, who advised her of the probation decision.  (Pltf.'s 56.1/Owens ¶¶ 67, 71.)  Those facts also do not rebut Defendants' statement that the decision itself was made by the Apprenticeship Committee.

was entitled pursuant to the Family and Medical Leave Act.. (Graham 56.1 ¶ 28; Pltf.'s 56.1/Graham ¶ 28.) There is no evidence that any of the attendance points Plaintiff accumulated were for FMLA-related leave, however, and Diane Anderson testified that Plaintiff requested FMLA leave only for childbirth, prior to the filing of her second charge of discrimination. (Anderson Dep., Ex. 13 to Graham 56.1, at 23-24.) Ms. Anderson testified, further, that any absence, whether for sickness or any other reason, is counted under the attendance policy. (Anderson Dep., Ex. 13 to Graham 56.1, at 47.) FMLA leave is not counted, but only if "the process" for requesting such leave is followed.

On September 25, the Apprenticeship Committee issued a notice removing Plaintiff from the Program for accumulating thirteen attendance points. (Graham 56.1 ¶ 29; Apprenticeship Committee Notice, Ex. 22 to Graham 56.1.) Apprenticeship Committee Member John Weil met with Plaintiff on September 30, 2005 to discuss her removal from the program for attendance reasons. (Graham 56.1 ¶ 35.) Despite her attendance record, which violated the standard for all hourly employees, Defendant Graham offered Plaintiff the opportunity to return to the position of machine operator, the position she had held prior to becoming an apprentice. (Graham 56.1 ¶¶ 36, 66.) Plaintiff did return to that position. She remains free to re-bid for an Apprentice Position or to challenge her removal by filing a union grievance, but has done neither of these things. (Graham 56.1 ¶ 37.)

Plaintiff admits that no other apprentices who had as many attendance points as she had were permitted to remain in the Apprenticeship Program. (Graham 56.1 ¶ 55.) She is aware, further, that during the time that she was an Apprentice, three male apprentices were removed from the Program. (Graham 56.1 ¶ 50.) Terrell Brown, like Plaintiff, was removed for poor attendance; Plaintiff denies this, but her unsupported assertion that "[m]ale apprentices were not removed from the program for absences that could qualify for FMLA leave" does not contradict Graham's evidence that Brown (who, like Plaintiff, was given a special allowance to remain in the program despite a

11

poor attendance record as of July 2005) was removed from the Apprentice Program on August 3, 2005 when he had accumulated 12.5 attendance points. (Notice of Removal, Ex. 31 to Graham 56.1.) Two years earlier, Richard Garcia was removed from the program for poor attendance; unlike Plaintiff, Mr. Garcia was not permitted to return to the position he had held before entering the program. (Graham 56.1 ¶ 54.) Leonard Morgan was removed from the program in 2004, and Kevin Moore in 2002, for poor work performance. (Graham 56.1 ¶¶ 56, 57.)

It is undisputed that Plaintiff was not removed from the Apprenticeship Program for poor work performance. (Pltf.'s 56.1/Graham ¶ 122.)

On July 5, 2006, Plaintiff filed her third charge of discrimination. (July 5, 2006 Charge, Ex. 6 to Owens 56.1.) In this third charge, she alleges that she was removed from the training program in October 2005 and disciplined in June 2006 in retaliation for her September 2004 charge of discrimination. None of the parties has offered any evidence concerning the June 2006 discipline, however.

## DISCUSSION

Being the only woman in an otherwise-all-male work force was a significant challenge for Plaintiff Yolanda Murphy. She believes she was not treated fairly in the Apprenticeship Program, and there is evidence that she had some difficulties learning the skills required of a journeyman. Records show, however, that Plaintiff did complete at least half of the training hours required by the Apprenticeship Standards, and all of the course work required for certification as a journeyman. And it is undisputed that she was not removed from the program on the basis of work performance. It is also undisputed that Plaintiff never lost straight pay or overtime pay while she was in the program. What remains at issue on these motions are (a) whether Defendant Owens is liable under Title VII for a failure to train Plaintiff from February through September 2004 and (b) whether Defendant Graham violated Title VII by imposing two periods of probation in 2005 and, several months later, for terminating Plaintiff on the basis of her attendance record.

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In determining whether a genuine issue of material fact exists, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court is not required to draw every conceivable inference from the record; "mere speculation or conjecture" will not defeat a summary judgment motion. *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (citation omitted).

**<u>Defendant Owens: Claim of Failure to Train</u>**

As described above, Plaintiff filed her first and second charges of discrimination when Defendant Owens owned the plant. She settled the first claim in April 2004. In her second charge of discrimination, filed on September 23, 2004, Plaintiff alleges that soon after she entered into the settlement, Defendant began evaluating her work on a daily basis and gave her a poor overall evaluation in August 2004. She claimed that this adverse action was a function of sex discrimination and retaliation in violation of Title VII. She can prove her claims either by offering direct or circumstantial evidence of discriminatory motivation, or by the "indirect method," in which she presents evidence that she was treated less favorably than similarly-situated employees outside her protect group. *See generally Szymanski v. County of Cook*, 468 F.3d 1027, 1029 (7th Cir. 2006) (retaliation claim); *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir.2007) (sex discrimination claim).

Although her charge referred only to increased scrutiny of her work and the August 2004 performance evaluation, Plaintiff's claims against Owens are focused, as described above, on difficulties with her male co-workers and their alleged refusal to provide the on-the-job training that

she believed she needed. In any event, Plaintiff's concerns regarding increased scrutiny and the August 2004 performance evaluation require little discussion. Defendant Owens asserts that the April 2004 Mediation Agreement, in which Owens agreed to "ensure that [Plaintiff was] provided the same training opportunities as all other apprentices," called for close monitoring of Plaintiff's work. (Mediation Settlement Agreement, Ex. 16 to Owens 56.1.) Plaintiff has offered nothing to rebut that assertion. Although there is no evidence that any male worker received daily evaluations, at least one other male worker was subject to increased scrutiny; that worker was treated less favorably than she, however, as he was ultimately terminated from the Apprenticeship Program for poor performance. Nor has Plaintiff presented any evidence that the August 2004 performance evaluation was inaccurate.

Plaintiff's training concerns are more difficult to assess. To establish a claim that Owens discriminated against her by a failure to provide training, Plaintiff must demonstrate (1) that she is a member of a protected group (in this case, the only woman in the Apprenticeship Program); (2) that Owens provided training to workers in her position (undisputed here) ; (3) that she was eligible for the training (again, undisputed); and (4) that she was denied training given to other similarly situated workers (here, male participants in the program). *See Malacara v. City of Madison*, 224 F.3d 727, 729 (7th Cir. 2000) (*citing Pafford v. Herman,* 148 F. 3d 648, 657 (7th Cir. 1998).) Of these elements, three are undisputed. In arguing that there are no disputes of fact on the fourth element–denial of training–Defendant Owens emphasizes Plaintiff's testimony that at least one mechanic (evidently not himself a journeyman) provided daily training to her over an unidentified period of time; that another journeyman did train her "every once in a while;" and that at some unspecified time, a journeyman provided training on a particular piece of equipment (the "tray maker"). Owens notes, further, that Plaintiff had completed half of the 8,000 hours of training required for journeyman status under the Apprenticeship Program Standards. But Plaintiff steadfastly denies receiving training from her co-workers: She testified that she "didn't have no

journeyman training me in 2004;" that "as for the training, was nobody training me;" and that "[i]t wasn't like they had somebody on the machine helping me out, training me, no."

After the parties entered into the Mediation Settlement Agreement, Defendant asserts, Plaintiff was moved to the day shift where her direct managers, Ed Motes and Mike Halinski, could perform daily monitoring and evaluation of her work. Diane Anderson and Keith Clark state in their affidavits that Halinski and Motes had the skills and abilities to train Plaintiff. Notable for its absence, however, is any evidence that Halinski or Motes actually did so. Halinski's own affidavit describes his evaluations of Plaintiff's poor work performance but makes no mention of any efforts to train her. (Halinski Aff., Ex. 14 to Graham 56.1.) Plaintiff, for her part, acknowledges that Motes and Halinski gave her feedback on her performance, but insists she was left to learn the job on her own.

The parties appear to agree that apprentices were trained on the job by journeymen, and Plaintiff insists the journeymen with whom she worked refused to work with her. Some of the journeymen told her co-workers that she "might hurt them." Others reportedly wrote a letter to Ed Motes stating their unwillingness to provide training. Defendants object to Plaintiff's testimony about this letter as hearsay, but Plaintiff is not offering its contents for their truth. It is not clear from Plaintiff's testimony whether she herself ever saw the letter itself, but Motes has not denied receiving such a letter, and Plaintiff's testimony that the journeymen did not in fact train her stands unrebutted. At least one journeyman, himself responsible for training, told Plaintiff directly that she would not "make it through the program." Unidentified co-workers mocked Plaintiff by fashioning a "tool" for her from a piece of foam rubber; Plaintiff was not specific about the date on which this occurred, but again, Defendants have not denied that it happened or explained what action, if any, managers took to ensure that her co-workers' hostility did not interfere with Plaintiffs' training.[9]

---

[9] Defendants do object that a "hostile environment" claim is not properly before the
(continued...)

In this context, the fact that Plaintiff, like Leonard Morgan, had completed 4,000 hours of training does not defeat her claim. The Apprenticeship Standards refer to the 8,000 required hours as "work experience requirements," suggesting to the court that an apprentice earned the hours merely by being assigned to particular tasks, not by virtue of any supervised training or instruction. In its reply memorandum, Owens suggests that Plaintiff has a "fundamental misunderstanding of the Apprenticeship Program's structure and purpose." (Defendant Owens Reply Mem., at 3.) According to Owens, apprentices were expected to "learn by doing and observing others. . . . If Plaintiff believes that training constitutes standing side-by-side a journeyman mechanic each and every minute of her workday, she is mistaken." (*Id.* at 3-4.) The court agrees with Owens that any expectation of full-time one-on-one training would be unrealistic. As the court understands Plaintiff's position, however, it is not that she was denied full-time training, but that she was denied the kind of training and assistance from journeymen that male apprentices enjoyed. The court concludes there are disputes of fact on this issue, and denies Owens' motion for summary judgment on Plaintiff's sex discrimination claim.

In reaching this conclusion, the court notes that should she prevail on this claim, Plaintiff's damages may be limited to her claim that being deprived of training generated emotional distress for her. Although she received critical performance evaluations, Plaintiff lost no pay or benefits during the time that Owens owned the plant, and was not even placed on probation before it was sold to Graham in October 2004. She was ultimately removed from the program, but not for any reason related to her performance. There is, in short, no evidence that Owens' alleged failure to provide appropriate training resulted in her lack of success as an apprentice. Finally, Plaintiff points to no evidence in the record that she made any specific complaints of discrimination to Motes or

---

[9](...continued)
court. They have not challenged the court's jurisdiction over Plaintiff's failure-to-train claim, however, and the court views evidence of the hostile behavior of Plaintiff's co-workers as relevant to her claim that they refused to participate in her training.

Halinski, and as there is no evidence that Halinski, Motes, or any of Plaintiff's co-workers were aware that she had filed charges with the EEOC, her retaliation claim against Owens is dismissed.

**<u>Defendant Graham: Probation and Termination</u>**

Defendant Graham purchased the plant in October 2004. Plaintiff was placed on probation for the first time in January 2005 and a second time in July 2005. In September of that year, she was removed from the Apprenticeship Program on the basis of her attendance. In her third charge of discrimination, Plaintiff alleges that Defendant Graham took this action in retaliation for her September 2004 charge of discrimination. Because Plaintiff has not offered direct or circumstantial evidence sufficient to support such a claim under the "direct method," the court considers whether she can prevail under the "indirect method" for proving retaliation. As the Seventh Circuit has explained, Plaintiff can establish a prima facie case of retaliation by offering evidence that "(1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite meeting her employer's legitimate expectations, she suffered a materially adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002), quoted in *Atanus v. Perry*, No. 07-1430, ___ F.3d ___, 2008 WL 696908, at *11 (7th Cir. Mar. 17, 2008). If the employee presents evidence on each of these elements, the employer must offer a legitimate, non-discriminatory reason for the adverse employment action. If the employee is unable to demonstrate that this reason is pretextual, the employer is entitled to summary judgment.

In her response to Defendant Graham's motion for summary judgment, Plaintiff argues generally that she was subject to a hostile environment during her employment. She makes no specific reference to the two periods of probation imposed on her in 2005, nearly a year before the filing of her third charge, and makes no attempt to identify apprentices who had not complained of discrimination but were treated more favorably. Nor has she suggested any basis for concluding

that members of the Plant Apprenticeship Committee were motivated by, or even aware of, the fact that she had previously filed charges of discrimination, when they issued the probation notices. In order to prevail here under the direct method of proof, Plaintiff must establish "that the *decisionmaker* has acted for a prohibited reason." *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003) (emphasis in original). *Cf. Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900 (7th Cir. 2006) (plaintiff prevails on summary judgment by presenting circumstantial evidence that her complaint of discrimination was a cause of adverse employment action). Assuming her challenge to those probation notices is appropriately before the court, Graham is entitled to summary judgment on that challenge.

In fact, as noted, Plaintiff has not pressed the matter of the probation notices; in her response to Graham's motion, Plaintiff focuses on the decision to remove her from the Apprenticeship Program in September 2005. Defendant Graham is clearly entitled to summary judgment on this claim, as well. Assuming that Plaintiff could establish a prima facie case of retaliation, Graham would nevertheless prevail because its evidence of a legitimate, non-discriminatory reason for the removal decision is unrebutted. In July 2005, Graham tightened its attendance policy for apprentices. Plaintiff, whose attendance record would have called for removal under the new policy, was given an allowance of additional attendance "points" she could incur before facing removal. Within a few weeks, Plaintiff did in fact incur additional attendance points. She does not deny that she was absent from work, nor does she challenge the point totals. There is no evidence that any worker with a similar record was allowed to remain in the program, and not even a suggestion that workers who had not complained of discrimination were treated more favorably.

Plaintiff's only challenge to Graham's decision to remove her for poor attendance is the suggestion that some (unidentified) previous absences should have been excused as FMLA leave. She offers no response to Defendant's evidence that Plaintiff's only request for FMLA leave was

18

honored. In any event, Plaintiff has not asserted an FMLA claim in this lawsuit, and there is no evidence that any such claim would have merit. The Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, requires employers to make allowances for absences that are the result of a "serious health condition" – that is, one that requires inpatient care or a period of incapacity of more than three consecutive days, or continuing treatment by a health care provider. 29 C.F.R. § 825.114(a). No reasonable trier of fact could find that Plaintiff was entitled to FMLA leave for her two days of absence in September 2005. And if there were some previous absence for which Plaintiff was entitled to such leave, there would still be no basis for concluding that enforcing the attendance policy against Plaintiff in September 2005 was a product of retaliation. Despite having incurred enough absences to be terminated even under Graham's plant-wide policy, Plaintiff was permitted to remain at work in her previous job. She was treated more favorably, not less favorably, than other workers.

## **CONCLUSION**

Defendant Graham's motion for summary judgment (105) is granted. Defendant Owens' motion (109) is granted in part and denied in part. Defendants' motions to strike (127, 129) are granted in part and denied in part, as reflected in the court's statement of facts. The parties are

encouraged to attempt to reach a settlement. This matter is set for status conference on April 14, 2008, at 9:00 a.m.

ENTER:

Dated: March 25, 2008

_____
REBECCA R. PALLMEYER
United States District Judge